UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIESTA VENTURES OF BEVERCREEK, LLC, an Ohio limited liability company; FIESTA VENTURES DM, LLC, an Ohio limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>QDOBA RESTAURANT CORPORATION, a Colorado corporation; QDOBA FRANCHISOR LLC, a Delaware limited liability company,<br><br>Defendants. | Case No.: 24-CV-2218 JLS (BLM)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'** ***EX PARTE*** **MOTIONS FOR TEMPORARY RESTRAINING ORDERS AND ORDERS TO SHOW CAUSE RE PRELIMINARY INJUNCTIONS**<br><br>(ECF Nos. 2, 4) |

Presently before the Court are Plaintiffs Fiesta Ventures of Bevercreek, LLC ("Fiesta Ventures Bevercreek") and Fiesta Ventures DM, LLC's ("Fiesta Ventures Dayton") (collectively, "Plaintiffs") respective *Ex Parte* Motions for Temporary Restraining Orders and Orders to Show Cause Re Preliminary Injunctions ("Bevercreek TRO," ECF No. 2; "Dayton TRO," ECF No. 4) against Defendants Qdoba Restaurant Corporation and Qdoba Franchisor LLC (collectively, "Qdoba" or "Defendants"). Plaintiff Fiesta Ventures Bevercreek accompanied its Motion with a supporting Memorandum of Points and

Authorities ("Beavercreek TRO Mem.," ECF No. 2-1), a Declaration from Fiesta Ventures Bevercreek and Fiesta Ventures Dayton's manager and principal, Shalinder Kular ("Kular Decl.," ECF No. 2-2), and Certification of John K. Landay ("Bevercreek TRO Cert.," ECF No. 2-3). Plaintiff Fiesta Ventures Dayton accompanied its Motion with a Memorandum of Points and Authorities ("Dayton TRO Mem.," ECF No. 4-1), and Certification of John K. Landay ("Dayton TRO Cert.," ECF No. 4-2).

## BACKGROUND

Pursuant to a franchise agreement dated August 12, 2019 ("Dayton Franchise Agreement"), between Fiesta Ventures Dayton and Qdoba, Fiesta Ventures Dayton has operated a Qdoba Mexican Eats restaurant at 1524 Miamisburg Centerville Road, Dayton, Ohio 45459 ("Dayton Location"), since October 2019. Dayton TRO Mem. at 4.[1]

On or about July 15, 2022, Fiesta Ventures Bevercreek entered into a franchise agreement ("Bevercreek Franchise Agreement") with Qdoba whereby Fiesta Ventures Bevercreek would operate a Qdoba Mexican Eats restaurant at 2476 Commons Boulevard, Beavercreek, Ohio 45431 ("Bevercreek Location"). Dayton TRO Mem. at 6. The Bevercreek Location is not yet in operation.

On or about February 12, 2024, after receiving notice that Fiesta Ventures Bevercreek was in default of its lease agreement, Qdoba sent Fiesta Ventures Bevercreek a Notice of Default / Termination of Franchise Agreement. *Id.* On or about February 28, 2024, Fiesta Ventures Bevercreek and Qdoba entered into a Workout Agreement whereby Fiesta Ventures Bevercreek, among other requirements, (a) would pay the initial franchise fee of $30,000, which as of that date, had not been paid, (b) would complete the tasks necessary to open the restaurant, and (c) would open the restaurant no later than May 31, 2024. *Id.* Fiesta Ventures Bevercreek has since paid this amount. *Id.* at 6–7.

---

[1] The Court cites Plaintiff Fiesta Ventures Dayton's TRO Memorandum for the factual background, as Plaintiff Fiesta Ventures Bevercreek's TRO Memorandum recites identical facts. *See* Dayton TRO Mem. at 4 ("The recitation of facts is identical to the recitation of facts in Fiesta Ventures Bevercreek's similar motion filed concurrently herewith."); *see* Bevercreek TRO Mem. at 3–10.

Fiesta Ventures Bevercreek then worked to complete the construction, obtain a certificate of occupancy, and obtain permits. *Id.* at 7–8. Between September 24 and 27, 2024, Mr. Kular communicated with John Claflin, the Director of Franchise Support for Qdoba corporate offices, regarding an extension to open until the end of October. *Id.* at 8. Mr. Claflin advised that a mid-October 2024 opening was acceptable. *Id.*

On September 30, 2024, Waelco Properties, landlord for the Bevercreek Location, notified Fiesta Ventures Bevercreek and Qdoba that it had purportedly terminated the lease because Fiesta Ventures Bevercreek failed to meet the opening deadline. *Id.* This notification precipitated this current dispute between Fiesta Ventures Bevercreek and Qdoba. *Id.*

On October 8, 2024, Fiesta Ventures Bevercreek sought and was granted a temporary restraining order preventing Waelco Properties from interfering with its efforts to obtain a certificate of occupancy and open the restaurant. *Id.* On or about October 31, 2024, Waelco Properties and Fiesta Ventures Bevercreek entered into a Second Amended and Restated Forbearance Agreement and Amendment to Lease whereby, among other requirements, Fiesta Ventures Bevercreek would have "a certificate of occupancy and operating the restaurant on December 2, 2024." Plaintiffs solely argue Fiesta Ventures Bevercreek and Fiesta Ventures Dayton have each spent "significant time and approximately $800,000" developing their respective locations, and that Qdoba's improper termination of the Bevercreek Franchise Agreement, and forced closure of the Dayton Location, deprive Plaintiffs of their rights under their respective agreements with Qdoba to operate its business. *See* Bevercreek TRO Mem. at 14; Dayton TRO Mem. at 14. However, Plaintiffs cite no authority supporting granting an unnoticed TRO in this context.[2] *Id.* at 8–9.

---

[2] Plaintiffs cite only one case—a district court case from outside this Circuit—where a court found irreparable harm from the termination of a franchise agreement, and such case arose in the context of a request for preliminary injunction, not an unnoticed TRO. *See Manpower Inc. v. Mason*, 377 F.Supp.2d 672, 677 (E.D. Wis. 2005).

On October 1, 2024, precipitated by Waelco Properties' letter of September 30, 2024, purportedly terminating the Bevercreek Lease, Qdoba sent Fiesta Ventures Bevercreek a Notice of Termination of the Bevercreek Franchise Agreement based in part on Fiesta Ventures Bevercreek's failure to open the restaurant by the date specified in the Workout Agreement and in part on Qdoba being informed that the Bevercreek Lease had been terminated as of September 30, 2024. *Id.* at 9.

On October 1, 2024, and October 2, 2024, Mr. Kular again communicated with Mr. Claflin concerning the termination notice. *Id.* Mr. Claflin advised him that Fiesta Ventures Bevercreek needed to maintain control of the Bevercreek Location before Qdoba would reinstate the Bevercreek Franchise Agreement. *Id.*

Fiesta Ventures Bevercreek continued to develop the Bevercreek Location, and Mr. Kular was in regular communications with Mr. Claflin, keeping him apprised of the status of the Bevercreek Lease and the certificate of occupancy. *Id.* By October 11, 2024, Fiesta Ventures Bevercreek was issued a Temporary Occupancy Certificate (TCO) for thirty (30) days, subject to a few conditions, and in the week that followed, the construction passed all final inspections. *Id.* On October 24, 2024, a TCO was approved to Fiesta Ventures Bevercreek for an additional ninety (90) days and Fiesta Ventures Bevercreek was explicitly granted the right to open to the public.[3]  *Id.* at 9–10.

On October 25, 2024, "Illinois counsel" for Fiesta Ventures Bevercreek informed counsel for Qdoba of the temporary restraining order and the certificate of occupancy and sought to reinstate the Bevercreek Franchise Agreement."[4]  *Id.* at 10. Shortly thereafter, Mr. Kular reached out to Mr. Claflin to apprise him that Fiesta Ventures Bevercreek had

---

[3] Though not entirely clear, the Court understands such TCO to be granted by either the city of Bevercreek or Greene County Department of Building Regulation.  *See* Dayton TRO Mem. at 7 ("Fiesta Ventures Bevercreek diligently worked with the city of Beavercreek and the Green County Department of Building Regulation to obtain a certificate of occupancy.").

[4] The Court, while uncertain as to whom "Illinois counsel" refers, recites this fact as written by Plaintiffs.

satisfied all the conditions to open the location for business, namely "that (a) it had secured the Dayton Location,[5] (b) it had the necessary governmental permits for its operations, and (c) Fiesta Ventures was able to open its doors for business immediately." *Id.*

Mr. Claflin then informed Mr. Kular that Qdoba was no longer interested in opening the Bevercreek Location. *Id.* On or about November 1, 2024, Illinois counsel for Fiesta Ventures Bevercreek contacted Qdoba's "Virginia corporate counsel" to reach an amicable resolution of the issues to no avail.[6] *Id.*

On November 13, 2024, counsel for Qdoba sent a letter to counsel for Fiesta Ventures Bevercreek, copying Fiesta Ventures Bevercreek and Fiesta Ventures Dayton, informing them that not only would it not reinstate the Bevercreek Franchise Agreement but that it was also terminating the Dayton Franchise Agreement. *Id.* However, Qdoba granted Fiesta Ventures Dayton a temporary license through December 12, 2024, so it might find a third party to purchase the franchise. *Id.* at 10–11.

Plaintiffs argue Defendants have breached the Bevercreek Franchise Agreement by refusing to allow Fiesta Ventures Bevercreek to open. Bevercreek TRO Mem. at 2. Plaintiffs also argue Defendants breached the Dayton Franchise Agreement by terminating the agreement without adequate basis. Dayton TRO Mem. at 3. Fiesta Ventures Bevercreek requests the Court issue a temporary restraining order enjoining Qdoba from (1) terminating the franchise agreement between Fiesta Ventures Bevercreek and Qdoba dated July 15, 2022, (2) interfering with Fiesta Ventures Bevercreek opening a Qdoba Mexican Eats restaurant at the Bevercreek Location, and (3) doing any act that violates its contractual obligations under the franchise agreement that would prevent Fiesta Ventures Bevercreek from opening and operating the restaurant; and for an order to show cause as to why the Court should not enter a preliminary injunction granting the same relief.

---

[5] The Court notes Plaintiffs write "Dayton Location," however, the Court understands Plaintiffs to mean the Bevercreek Location, as Plaintiffs do not indicate the security of the Dayton Location was at issue.

[6] As above, the Court recites this fact as written by Plaintiffs, although the Court is uncertain as to whom Virginia corporate counsel refers.

1  Bevercreek TRO Mem. at 3.  Fiesta Ventures Dayton requests the Court issue a temporary
2  restraining order enjoining Qdoba from (1) terminating the franchise agreement between
3  Fiesta Ventures Dayton and Qdoba, and (2) doing any act that violates its contractual
4  obligations under the franchise agreement that would interfere with Fiesta Ventures Dayton
5  operating the Qdoba Mexican Eats restaurant at the Dayton Location; and for an order to
6  show cause as to why the Court should not enter a preliminary injunction granting the same
7  relief.  Dayton TRO Mem. at 3–4.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 65(b) governs the issuance of a temporary restraining order ("TRO").  The standard for a TRO is identical to the standard for a preliminary injunction.  *Frontline Med. Assocs., Inc. v. Coventry Healthcare Worker's Comp., Inc.*, 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009).  A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and is "never awarded as of right."  *Id.* at 22, 24.

When a plaintiff has not provided notice of their TRO application to the defendant, Federal Rule of Civil Procedure 65(b)(1) imposes additional requirements.  Namely:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

1  Fed. R. Civ. P. 65(b)(1). "The stringent restrictions imposed . . . by Rule 65[] on the
2  availability of *ex parte* temporary restraining orders reflect the fact that our entire
3  jurisprudence runs counter to the notion of court action taken before reasonable notice and
4  an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods,*
5  *Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438–39 (1974) (footnote omitted).

6  "Courts have [thus] recognized very few circumstances justifying the issuance of an
7  *ex parte* TRO." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).
8  "For example, an *ex parte* TRO may be appropriate 'where notice to the adverse party is
9  impossible either because the identity of the adverse party is unknown or because a known
10 party cannot be located in time for a hearing.'" *Id.* (quoting *Am. Can Co. v. Mansukhani*,
11 742 F.2d 314, 322 (7th Cir. 1984)). Alternatively, "[i]n cases where notice could have
12 been given to the adverse party, courts have recognized 'a very narrow band of cases in
13 which *ex parte* orders are proper because notice to the defendant would render fruitless the
14 further prosecution of the action.'" *Id.* (quoting *Am. Can Co.*, 742 F.2d at 322). Generally
15 speaking, this "narrow band" includes only situations wherein an *ex parte* order is
16 necessary "to preserve evidence or the court's jurisdiction." *Am. Can Co.*, 742 F.2d at 323
17 n.11 (citing *In re Vuitton et Fils S.A.*, 606 F.2d 1, 3, 5 (2d Cir. 1979) (per curiam)).

## DISCUSSION

19 Plaintiffs' Motions focus almost entirely on the *Winter* factors. In so structuring
20 their arguments, Plaintiffs ignore "the threshold question that arises anytime a party seeks
21 a restraining order *ex parte*: have Plaintiffs presented an adequate justification for failing
22 to give notice to the Defendant?" *Adobe Sys., Inc. v. S. Sun Prods., Inc.*, 187 F.R.D. 636,
23 638 (S.D. Cal. 1999). While Plaintiffs' counsel indicates Plaintiffs "are in the process
24 of serving the Complaint, Summons, and Motion in this action upon Defendants through a
25 process server and will also email the service documents to Defendants' counsel by the
26 close of business on November 26, 2024," *see* Bevercreek TRO Cert. at 2–3; *see also*
27 Dayton TRO Cert. at 2–3, at present there is no proof of service or notice to Defendants of
28 the *ex parte* applications for TROs. *See generally* Docket. Accordingly, the Court

"declines to assume the alleged notice was offered, let alone, adequate." *See MG Pharmacy LLC v. Cardinal Health 110 LLC*, No. CV-21-01747-PHX-SPL, 2021 WL 6845294, at *1 (D. Ariz. Oct. 15, 2021); *see also Globalization Partners, Inc. v. Layton*, No. 19-cv-01990-BAS-LL, 2019 WL 5268657, at *2 (S.D. Cal. Oct. 16, 2019) ("Because there is no proof of service or other documentation reflecting that service was completed, it is unclear whether Defendant received notice of this proceeding. Hence, for purposes of this Order, the Court assumes Defendant was not provided notice of the instant application and construes Plaintiff's application as a request to issue the TRO without providing notice to Defendant."). Moreover, "service by email does not constitute formal service designed to ensure notice even in the context of an ex parte application for a TRO." *SDLA Courier Serv., Inc. v. City Cap. NY LLC*, No. 2:24-cv-08115-MRA-E, 2024 WL 4868278, at *3 (C.D. Cal. Sept. 24, 2024) (collecting cases).

Plaintiffs' counsel indicates "[f]urther notice to Defendants and the opportunity for Defendants to respond in opposition prior to entry of a temporary restraining order should not be required as any delay in injunctive relief will result in irreparable loss and unquantifiable damage to [Plaintiffs]." Bevercreek TRO Cert. at 3; Dayton TRO Cert. at 3. But to secure a TRO without notice, Plaintiffs' general argument of irreparable harm alone is not enough. Rather, "courts have recognized very few circumstances justifying the issuance of an ex parte TRO." *Reno Air Racing Ass'n,* 452 F.3d at 1131. "For example, an ex parte TRO may be appropriate 'where notice to the adverse party is impossible either because the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing.'" *Id.* (quotation omitted). Alternatively, "[i]n cases where notice could have been given to the adverse party, courts have recognized a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action.'" *Id.* (quoting *Am. Can Co.*, 742 F.2d at 322). Generally speaking, this "narrow band" includes only situations wherein an *ex parte* order is necessary "to preserve evidence or the court's jurisdiction." *Am. Can Co.*, 742 F.2d at 323 n.11 (citation omitted).

Here, Plaintiffs argue Fiesta Ventures Bevercreek and Fiesta Ventures Dayton have each spent "significant time and approximately $800,000" developing their respective locations, and that Qdoba's improper termination of the Bevercreek Franchise Agreement, and forced closure of the Dayton Location, deprive Plaintiffs of their rights under their respective agreements with Qdoba to operate their businesses. *See* Bevercreek TRO Mem. at 14; Dayton TRO Mem. at 14. However, Plaintiffs cite no authority supporting granting an unnoticed TRO in this context.[7] Nor have Plaintiffs shown that this case falls into the "very narrow" category of cases where *ex parte* orders are proper. *See Globalization Partners, Inc.*, 2019 WL 5268657, at *2 (holding that the plaintiff's attempted service of the TRO negated any claim that notice would frustrate the prosecution of the plaintiff's case).

The Court will thus (1) construe the Motions as Motions for Preliminary Injunctions and (2) set a briefing schedule that gives Defendants the minimum time to respond outlined by the Court's local rules. *See id.*; *see also* S.D. Cal. Civ.L.R. 7.1(e)(1)–(2) (ensuring defendants have at least two weeks to respond to a noticed motion).

## CONCLUSION

In light of the foregoing, the Court **ORDERS** as follows:

1. Plaintiffs' requests for both *ex parte* TROs (ECF Nos. 2, 4) are **DENIED**. Accordingly, the Court **VACATES** the previously set expedited briefing schedule and December 12, 2024 hearing on the Motions.

2. Plaintiffs' requests for orders to show cause why preliminary injunctions should not issue are **GRANTED**. The Court will construe Plaintiff's Motions as Motions for Preliminary Injunctions. Plaintiffs **SHALL SERVE** Defendants with a copy of this Order and **FILE PROOF OF SERVICE** within two (2) weeks of the date of this Order.

---

[7] Plaintiffs cite only one case—a district court case from outside this circuit—where a court found irreparable harm from the termination of a franchise agreement, but that case arose in the context of a request for preliminary injunction, not an unnoticed TRO. *See Manpower Inc. v. Mason*, 377 F. Supp. 2d 672, 677 (E.D. Wis. 2005).

Defendants **SHALL FILE** oppositions or statements of non-opposition to each Motion <u>on or before December 31, 2024</u>. Plaintiffs **MAY FILE** their respective replies <u>on or before January 7, 2025</u>.

    3.    A hearing on Plaintiffs' Motions for Preliminary Injunctions is **SET** for <u>Thursday, February 6, 2025, at 10:00 a.m.</u> in Courtroom 4D of the Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, CA, 92101.

    **IT IS SO ORDERED.**

Dated: December 3, 2024

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge